**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT FOR THE STATE OF MISSISSIPPI**
**HATTIESBURG DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA, ex rel** | * | **CIVIL ACTION** |
| **SHERIE CONRAD** | * | |
| | * | **NUMBER: 2:99-cv-72-GR4** |
| | * | |
| **Plaintiffs** | * | **FILED IN CAMERA** |
| | * | |
| **VERSUS** | * | **and UNDER SEAL** |
| | * | |
| **BLUE CROSS AND BLUE SHIELD OF** | * | |
| **MISSISSIPPI, A MUTUAL INSURANCE** | * | |
| **COMPANY, d/b/a TRI-SPAN HEALTH** | * | |
| **SERVICES** | * | **JURY TRIAL REQUESTED** |

* * * * * * * * * * * * * * * * * * * * * * * * * *

**ORIGINAL AND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF**
**UNDER TITLE 31 U.S.C. SECTION 3729, ET. SEQ.**
**POPULARLY KNOWN AS THE FALSE CLAIMS ACT**

1.

This is an action to recover damages and civil penalties on behalf of the United States of America pursuant to the provisions of Title 31 U.S.C.S. Section '3729, et seq. popularly known as the "False Claims Act," for the false claims presented, reviewed and certified by defendant, a designated Medicare intermediary on behalf of HCFA, in violation of the provisions of 42 U.S.C.S. Section 1395h, for acts of gross negligence, and/or with the intent by key management officials of the intermediary, to defraud the United States.

2.

This action seeks to recognize and recover damages for the false claims presented by Medicare providers and for the failure of a designated intermediary on behalf of HCFA to recognize and/or terminate fraudulent schemes and related party transactions.

3.

Due to these acts by the designated Medicare Intermediary through its key management and/or executives, the said Intermediary acted beyond the scope of its duties and obligations to the United States Government, which resulted in the perpetuation of false claims presented under the Federal Medicare program through the gross negligence by dispersing officers a the Federal Medicare program.

JURISDICTION

4.

Jurisdiction herein is based upon 28 U.S.C. Section 1331, on the basis that this action it involves a question regarding the application of 42 U.S.C. Section 1395 et seq. dealing with the actions of disbursing officers in the disbursements made under the Federal Medicare program.

5.

Jurisdiction is further based upon 28 U.S.C. Section 1332, as complete diversity of citizenship exists between all parties, and the amount in controversy exceeds the sum of $75,000.00.

6.

Jurisdiction is further based on 31 U.S.C.S. Section 3732 (a), which provides that "Any action under section 3730 [the False Claims Act] may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." The acts complained of herein occurred in part in the Southern District of the United States District Court for the State of Mississippi.

7.

This Court retains subject matter jurisdiction pursuant to 42 U.S.C.S. Section 1395h(i),

which provides that when agents of a designated Intermediary on behalf of HCFA act beyond the scope of duties and obligations to the Government, or when such actions by the Intermediary equal gross negligence or intent to defraud, an action may be maintained against the Intermediary.

## PARTIES TO THE ACTION

8.

Made Qui Tam Plaintiff herein is Sherie A. Conrad (hereinafter referred to as "Relator"), a citizen and resident of the State of Louisiana, who brings this action on behalf of the United States of America.

9.

As required under the False Claims Act, 31 U.S.C. Section 3730(a)(2), Relator has provided to the Attorney General of the United States and to the United States Attorney for the Southern District of Mississippi, with the filing of the original Complaint, a statement of all material evidence and information related to the Complaint. This disclosure statement supports the existence of overcharges, false claims, false statements, kick-back schemes, and "related party" transactions, without the proper disclosures by the Medicare providers, Mid South Management Company, Inc., Mid South Rehabilitation Agency of Mississippi, Inc. and/or Mid South Rehabilitation Agency of Louisiana, Inc. (hereinafter referred to collectively as "Mid-South Rehab Companies") to the designated Intermediary, Blue Cross and Blue Shield of Mississippi, A Mutual Insurance Company, d/b/a Tri-Span Health Services, which failed to recognize, report, and/or terminate those activities, despite its tacit knowledge and apparent disregard for audit procedures thereof, as is hereinafter set forth.

10.

Relator, president of Conrad Consulting Group, Common Sense Consulting Corporation and Mid-South Staffing Services, Inc. (all Louisiana corporations doing business in the State of

Mississippi) specializes in personnel staffing and business evaluation with an emphasis in healthcare. From 1974 to present, she and her related companies have provided direct personnel recruiting, as well as review and analysis of staff structure, to client companies in order to improve the efficiency, employee productivity, and work flow necessary to accomplish the objectives of the client companies. In 1993, Relator also began doing small business consulting, as well as educational and workplace seminar development for companies.

11.

Relator was introduced to the owner and president of the Mid-South Rehab Companies, Nathan Johnson, in October of 1995, for her management consultant and staffing expertise. Relator was hired in November of 1995 as a consultant for the Mid-South Rehab Companies by Nathan Johnson, to assist him with the rapid growth and transition his organization was experiencing as a result of increased revenue and an expanding base of operations. The terms of the relationship were confirmed in writing on or about December 9, 1995, with Relator remaining in this position from December 7, 1995 until March 25, 1996.

12.

Relator, Sherie Conrad, was employed as an outside consultant by Mid South Management Company and other related companies owned and/or controlled by Nathan Johnson (hereafter collectively referred to as "Mid South").

13.

The companies for which Relator was to provide these services, Mid-South Rehabilitation Agency of Mississippi, Inc. and Mid South Rehabilitation Agency of Louisiana, Inc., were certified Medicare providers, as well as Pyramid Management, Inc., (a Mississippi Corporation) and Mid-South Management Company, Inc. (a Louisiana Corporation), corporations formed as entities specifically to serve in a Home Office concept, similar to a holding company set up to manage and

4

direct the activities of two subsidiary companies.

14.

Mid South and its related entities were Mississippi corporations which were authorized Medicare providers of, primarily, physical therapy services throughout the State of Mississippi and parts of Louisiana; at all times material herein, the Medicare intermediary in Mississippi was one of the defendants herein, Blue Cross and Blue Shield of Mississippi, d/b/a, Tri-Span Health Services (hereafter "BCBS").

15.

Through her role as management consultant and personnel provider to the Mid-South Rehab Companies, Relator, in a period of less than 120 days from the commencement date of relationship, came to learn of approximately 5,000 fraudulent Medicare claims submitted in 1994 and 1995 by these Medicare providers, which claims were in excess of SIX MILLION ($6,000,000.00) DOLLARS in overpayments to the Mid-South Rehab Companies at that time. Upon information and belief, the pattern of practice of fraud was developed and executed by Nathan Johnson and the principals of the Mid-South Rehab Companies, and had been perpetuated since the inception of those companies in 1994.

16.

Despite having been informed of these false claims by Relator, Blue Cross failed to audit and/or investigate this matter, and failed to recognize, reject or to report these false claims to any supervising authority, and, therefore, committed acts of gross negligence in the performance of its survey and audit duties. This failure of Blue Cross to recognize and/or detect improperly reported costs, or to re-capture reimbursements improperly paid to the Provider, allowed the continued operation of the Mid-South Rehab Companies, which resulted in the continued fraud upon the United States Treasury.

17.

Based upon the statutory civil penalty of Ten Thousand Dollars ($10,000.00) for each false claim submitted and treble damages applied to the amount of the overpayments, Relator estimates the total amount to be recovered from the defendants to be in excess of ONE HUNDRED MILLION DOLLARS ($100,000,000.00).

18.

The defendants in this action are:

a.      Blue Cross and Blue Shield of Mississippi, A Mutual Insurance Company, d/b/a/ Tri-Span Health Services based on information and belief, a licensed insurer doing business in Mississippi, with its principal place of business located in Hinds County, in the State of Mississippi.

b.      David Albin, individually, a person of full age and majority, and a resident and domiciliary of the State of Mississippi, an executive level employee with Blue Cross, a company who is licensed to do business in the State of Mississippi.

c.      Sue Reno, individually, a person of full age and majority, and a resident and domiciliary of the State of Mississippi, an executive level employee with Blue Cross, a company who is licensed to do business in the State of Mississippi.

d.      Eddie Price, individually, a person of full age and majority, and a resident and domiciliary of the State of Mississippi, an executive level employee with Blue Cross, a company who is licensed to do business in the sate of Mississippi.

19.

Each of these BCBS employees, David Albin, Sue Reno, and Eddie Price, played an integral part in the payment of claims submitted to BCBS by Mid South as well as the auditing and investigation of Mid South.

20.

As an authorized Medicare provider, a company which is authorized by Medicare to provide services to individuals, and those services are paid for by reimbursement from Medicare on a "cost only" basis, that is, the Provider is not allowed to make a profit, it is only allowed to have its costs reimbursed.

21.

BCBS, as a Medicare intermediary, has been charged with the responsibility entrusted to it to ensure the program integrity of Medicare reimbursements. As a Medicare intermediary, BCBS is charged with the duty to recognize, report, and/or terminate illegal billing activities and to recoup funds paid on fraudulent Medicare claims. In this regard, it is the intermediary's responsibility to comply with strict audit procedures, established pursuant to Medicare guidelines, in regularly auditing the reimbursement submissions of Medicare providers.

22.

David Albin, defendant herein, was Director of Provider Audits for BCBS at all times material herein, and as a part of his duties was responsible for uncovering any fraudulent activities on the part of providers such as Mid South. Yet, David Albin concedes that he was never "aware of any claims of fraud on the part of" Mid South. David Albin, as Director of Audits, was grossly negligent in that he failed miserably in his legal responsibility to detect fraudulent activities of Medicare intermediaries and to take affirmative steps to report and terminate such illegal conduct, which was in violation of the False Claims Act. Relator, and others, repeatedly informed BCBS and David Albin of the fraudulent conduct of Mid South to no avail.

23.

At all times material herein, Sue Reno held the position of Program Integrity Officer for

BCBS and was in charge of insuring that Medicare intermediaries complied with applicable guidelines and regulations and that any allegations of fraud were timely investigated. Sue Reno failed to take any affirmative action to investigate or terminate the fraudulent conduct of Mid South despite receiving numerous complaints and reports of such conduct from both anonymous sources and relator. This gross negligence on the part of Sue Reno allowed Mid South to continue its criminal conduct unabated in violation of the FCA.

24.

Sue Reno specifically undertook no independent investigation of the fraud allegations which were reported to BCBS from 1995 to late 1998; rather, Sue Reno "opened a case and referred "*a complaint*" to government officials. This inadequate and grossly negligent conduct was in clear violation of the FCA; furthermore, defendant, Sue Reno, refused to investigate allegations of related company transactions, despite complaints of same, which would have been easily discovered upon a physical inspection of Mid South's businesses, which failures are directly attributable to Sue Reno.

25.

Sue Reno also continued to allow claims to be submitted to BCBS for payment by Mid South which she knew or should have known were false, fraudulent and uncollectible, all in violation of the FCA. Mid South engaged in a systematic scheme of remitting claims for payment, then withdrawing them when further documentation was requested; Sue Reno knew or should have known that this pattern was an obvious attempt to disguise requests for payment that were not legitimate.

26.

Eddie Price, in addition to his numerous other failings in his capacity as an auditor for BCBS, remitted payment to Mid South for expenses which he knew could not be charged back to

Medicare. During its operations, Mid South incurred significant legal expenses which were for the benefit of the corporation as well as the personal benefit of the principals. These expenses may not be recouped by a Medicare provider as a part of its overhead. Nevertheless, Mid South disguised these legal fees in its submissions to BCBS and was actually paid for same in clear violation of the Medicare guidelines for reimbursement. The relator, Sherie Conrad, became aware of this illegal conduct and immediately notified BCBS and Mr. Price. Despite being aware of the illegal nature of the payments to Mid South, Eddie Price did nothing. This failure to act with full notice of the illegality of the conduct of Mid South gives rise to liability on the part of this individual defendant.

27.

Furthermore, despite numerous complaints to BCBS and Eddie Price about the sham offices maintained by Mid South, Eddie Price did not conduct physical inspections of Mid South's facilities, which would have clearly revealed the fraudulent conduct on the part of Mid South. This gross negligence on the part of Eddie Price to fulfill his legal obligations constituted violations of the FCA for which he is liable.

28.

Relator alleges such gross negligence and other conduct on the part of the defendants set forth in the original Complaint as well as any other acts or omissions on the part of the defendants which may be adduced at trial on the merits or as discovery may reveal same. Furthermore, by their gross negligence, the individual defendants allowed clearly fraudulent claims to be presented for payment resulting in substantial financial losses to the Federal Government.

29.

Prior to the Budget Reform Act of 1997, those reimbursable costs include providing the

clinical services and the cost of its reasonable general and administrative overhead. That amount was then divided by the number of units of therapy services (15 minute increments) that were provided during a certain time period to create a "unit cost." This unit cost was then used as the factor to determine the amount for which Medicare would reimburse the provider in the next quarter. The unit cost was to be recalculated each quarter, and multiplied by the units of service in the next quarter to determine the appropriate Medicare reimbursement and preserve the funds of the U.S. Treasury for their intended use.

30.

Medicare providers are responsible for submitting monthly electronic billing requests and reports as well as annual cost reports after the close of each calendar year of operation. The designated Intermediary on behalf of HCFA is then responsible for the review, analysis, and supervision of reimbursement for reported costs within the program guidelines.

31.

Upon information and belief, it is illegal for a provider to knowingly and willfully offer to pay any remuneration (including kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person (1) to furnish or arrange for the furnishing of any item or service for which payment may be made in whole or in part by Medicare or Medicaid, or (2) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering, any good, facility, service, or item for which payment may be made in whole or in part under Medicare or Medicaid.

32.

A Medicare Intermediary is then responsible to ensure the proper reimbursement to a Provider of allowable costs (clinical and reasonable general administrative overhead), and to

conduct analysis of claims and expenses submitted in order to maintain program field survey of Provider facilities, and audit the cost reports submitted in order to maintain program integrity and supervise the proper expenditure of federal funds.

33.

Several corporations, CTX, Inc., JHL Development, Inc., Tri-Therapy Services, Inc., and LBJ Investments, Inc., were created in Mississippi by Nathan Johnson and his advisors, William P. Gaines and/or Dale Moore, through which Nathan Johnson, and his fellow shareholders in these enterprises, Lance Banks, Roger Heard and Bobby Long were able to divert profits derived from the over billing and inflated related party transaction cost reimbursement payments which were made by the Medicare program Intermediary, Blue Cross, to the Mid-South Rehab Companies.

34.

Tri-Therapy Services, Inc., a Mississippi Corporation, and CTX, Inc., a Mississippi Corporation, were created in or about 1993 and 1994 by Nathan Johnson, Roger Heard, Lance Banks and Bobby Long, the lawyer for Mid-South Management, in order to enter into staffing relationships with the Mid-South Companies. These companies provided clinical staffing on a contractual basis for the Mid-South Rehab Companies, which the Mid South Company reported as qualified expenditures for reimbursement through the Intermediary, Blue Cross.

35.

In addition, JHL Development, Inc. was created by Nathan Johnson, Roger Heard, and Bobby Long to collect the profits from CTX, Inc., for its owners Johnson, Heard and Long. JHL had no other mission or function, and none of these relationships were revealed to Medicare, nor were these relationships discovered by Blue Cross through the execution of its duties.

36.

In addition, LBJ Investments, Inc., was created by Nathan Johnson, Lance Banks and Bobby

Long to collect the profit from Tri-Therapy Services, Inc., for its owners Long, Banks, and Johnson. LBJ had no other mission or function, and none of these relationships were revealed to Medicare, nor were these relationships discovered by Blue Cross through the execution of its duties.

37.

Although Tri-Therapy routinely reserved a small percentage of its income for any potential tax liability, the balance of its income was sent into LBJ or given to Nathan Johnson in the form of cash.

38.

Although CTX routinely reserved a small percentage of its income for any potential tax liability, the balance of its income was sent into JHL or given to Nathan Johnson in the form of cash.

39.

Tri-Therapy Services, Inc., CTX, Inc., LBJ Investments, Inc., and JHL Developments, Inc., are all "related companies" because all transactions between these companies and their principals were under the direct and indirect control of Nathan Johnson, the owner and president of the Medicare Provider Mid-South Rehab Companies.

40.

These relationships constituted illegal transactions, as Providers are prohibited from knowingly or willfully receiving any remuneration of any kind from contractors in return for contracting clinical, administrative or general service with them. Nevertheless, Nathan Johnson personally consistently received remuneration through these related companies and transactions from those companies with which the Mid-South Rehab Companies contracted, and over which Nathan Johnson had substantial influence and control.

41.

Tri-Therapy was a "staffing partner" of the Mid-South Rehab Companies, that is, a company that provides therapists on a contract basis to perform the occupational therapy and speech therapy clinical services for which Provider Nathan Johnson, through Mid-South Rehab Companies, billed Medicare. Those therapists were paid by the staffing firm, Tri-Therapy, who billed Mid-South on an hourly basis for those services, and the Mid-South Rehab Companies in turn, captured that cost in its general and administrative budget and its clinical services, budget and used those figures to compute its unit costs to bill Medicare.

42.

Prior to the Budget Reform Act of 1997, this billing procedure was acceptable if the entities involved were not "related parties" and as long as none of the principals of the Mid-South Rehab Companies received any remuneration, including any kickback or rebate, directly or indirectly, overtly or covertly, in cash or in kind, for purchasing or ordering any goods, facilities, services or items for which payment may be made in whole or in part under Medicare or Medicaid, all of which was not the case between these enmeshed individuals and corporations, as explained hereinabove.  In addition, Blue Cross failed to uncover or investigate these relationships and transactions, in gross dereliction of its duty to audit the cost reporting and expense reimbursement of Providers, which needlessly deprived the Medicare program of millions of dollars of untold funds.

43.

In December 1995 Relator visited the Mid-South Rehab Companies corporate offices in Baton Rouge, Louisiana for a preliminary evaluation and survey of the corporate structure. After an in-house evaluation, lasting approximately ten days, an extensive management report was submitted to Nathan Johnson outlining the problems and the potential dangers relative to the business

operation of Pyramid Management and Mid-South Management, which were home office concept holding companies for Mid-South Rehab Companies of Louisiana, Inc. and Mid-South Rehab Companies of Mississippi, Inc.

44.

At that point in time, Nathan Johnson asked Relator to address issues with the Mississippi office and to investigate the performance of Tri-Therapy in its contract with the Mid-South Rehab Companies.

45.

Nathan Johnson had the ability to demonstrate control over and to dictate to Lance Banks and Roger Heard, how much money Tri-Therapy and CTX would be paid by Johnson and Mid-South Rehab Companies each month, regardless of the amount the invoices revealed for monthly services provided by these entities to the Mid--South Rehab Companies.

46.

On a monthly basis, Tri-Therapy was required to submit to Nathan Johnson an operating statement to evidence exactly what type of cash was needed to pay the bills, as well as the therapist's salaries, and Tri-Therapy received a check for that amount only. The balance of the money due Tri-Therapy was held by Mid-South Rehab Companies in its operating account under the control of Nathan Johnson, who had the ability to use any or all of said funds in any way he saw fit.

47.

Like Tri-Therapy, and Mid-South Rehab Companies of Mississippi, CTX and JHL engaged in a similar relationship with Mid-South Rehab Louisiana.

48.

Johnson formed Pyramid Management Company, Inc., as a Louisiana corporation, which

was structured to allow Johnson to utilize it for anonymity to acquire capital he was transferring through various entities so that no trace of monies that were deposited into this account could be related directly to him by name.

49.

Johnson also formed Pyramid Management Company, Inc., as an Alabama corporation, which was structured to allow Johnson to utilize it for anonymity to acquire capital he was transferring through various entities back to himself so that no trace of monies that were deposited into this account could be related directly back to him by name.

50.

William P. Gaines, CPA, advisor to Nathan Johnson, compiled information on the expenditures and reimbursements of Johnson's companies in order to prepare Cost Reports to be submitted to Blue Cross, and Gaines actively participated in assisting Johnson in knowingly defrauding Medicare as described hereinabove.

51.

Dale Moore, CPA an advisor to Nathan Johnson, was also a licensed Medicare Provider who contracted an employee of the Mid-South Rehab Companies to prepare and submit monthly billing reports to Blue Cross for reimbursements to Dale Moore's Provider company. Moore paid the employee for his services with funds which Blue Cross reimbursed, despite the fact that Johnson had already captured the employee's entire salary through reimbursement to the Mid-South Rehab Companies. Moreover, the employee then gave a portion of these funds received from Dale Moore directly to Johnson. Johnson then remitted payment back to Moore in the form of a retainer for his services as a CPA, which services were again reimbursed by Blue Cross to the Mid-South Rehab Companies. This complex arrangement resulted in multiple recoveries of cost for a single service.

52.

In May 1996, Gaines incorporated Mid-South Rehab Services. Inc., a new Louisiana entity, as a billing conduit for Medicare Part "A" business that was developed in Mississippi and Louisiana. Johnson's companies were licensed by Medicare to do only Part "B" business, so the billing of this Part "A" business was handled by Gaines through, Mid-South Rehab Services, Inc., which incurred no operating expenses or labor burdens and cooperated and participated in the knowing practice of defrauding the U.S. Treasury that was never recognized, addressed, or exposed as a result of the gross negligence of Blue Cross for the following reasons:

1)      The therapists who are actually performing the work to fulfill the Part "A" contract obligations were full time employees Mid-South Rehab Companies whose salaries were fully paid by the Mid-South billed to Medicare each month;

2)      The salaries of the administrative staff to generate the contracts and develop the business relationship between the nursing homes and Gaines' new company were fully paid for by Mid-South Rehab Companies and billed to Medicare each month;

3)      The billing for these services were handled personally by Amy Johnson Cole, Johnson's daughter whose salary was fully paid for by the Mid-South Rehab Companies and thus billed to Medicare for reimbursement each month.

4)      Gaines and Mid-South Rehab Services, Inc. are receiving an unfair profit at the expense of Medicare by capturing 100% of the revenue that is being generated by all of these individuals who were actually providing the services for his company when they were being paid by Mid-South Rehab Companies;

5)      Gaines as of April 1, 1996 was the Chief Financial Officer for the Mid-South Rehab Companies and was aware of the payment and capture of these expenses to Medicare and has made statements in a deposition on November 13, 1996 reflecting his knowledge and continuing

education in areas relevant to cost reporting and rehabilitation services.

6)    Gaines was aware of and contribute knowingly to the practice of mis-classifying marketing employees and expenses as "clinical" and continued to do so. In his deposition on November 13, 1996, Gaines, Chief Financial Officer for the Mid-South Rehab Companies, stated that Amy Johnson Cole was a "clinical" employee and denied that her duties were in the areas of public relations and marketing. The person in charge of accounts payable for the Mid-South Rehab Companies, Marcy Rucker, in her deposition held on the same day, testified that Amy Johnson was employed in the area of marketing.

53.

Dale Moore, as CPA and a consultant to the Mid-South Rehab Companies as well as personal advisor to Johnson, prepared the Medicare cost reports submitted to Blue Cross from the information provided to him by William P. Gaines, CPA. Moore was aware that public relations, marketing and entertainment expenses were not cost reimbursable items, but nevertheless prepared the Cost Reports for 1994 and 1995, wherein public relations, marketing and entertainment expenses were in fact captured, blended and disguised to fraudulently seek 100% reimbursement by Medicare and once again these infractions were not identified or recognized through the gross negligence of Tri-Span Health Services and/or its representatives.

54.

Amy Johnson Cole is the daughter of Nathan Johnson, owner and Administrator of the Mid-South Rehab Companies. Amy Johnson Cole assisted her father in the act of continuing to defraud the U.S. Treasury and his pattern and practice of double charging and engaging in related party transactions by accepting the transfer of ownership and control of two entities formed, incorporated, developed and operated by William P. Gaines and Johnson himself, namely, Mid-South Rehab Services, Inc., and Mid-South Contract Services, Inc., that continue to operate as related party

businesses whose transactions went unreported to Medicare, as required, allowing an unfair profit at the expense of Medicare.

55.

Steven Cole, the son-in-law of Nathan Johnson, owner and Administrator of the Mid-South Rehab Companies, assisted his father-in-law in continuing to defraud the U.S. Treasury and perpetuated Johnson's continuance of a pattern and practice of multiple identical charges and related party transactions by accepting a full time position as Assistant Administrator of the Mississippi Operation in August, 1996, and was provided a private residential luxury condominium on which the monthly note had been classified as commercial office space and was being reimbursed by Medicare. Additionally, Cole agreed to the transfer of ownership and control of two entities, formed, incorporated and developed and operated by William P. Gaines and Johnson, namely Mid-South Rehab Services, Inc. and Mid-South Contract Services, Inc., that continued to operate under Cole's control as related party businesses whose transactions went unreported to Medicare, allowing an unfair profit at the expense of Medicare and the United States taxpayers.

56.

Within approximately 120 days of the commencement of a relationship of the Mid-South Rehab Companies, Relator recognized and recorded the information on most of the infractions (with the exceptions of the two companies opened in the Spring of 1996 by Gaines that were later transferred to Johnson's daughter, Amy Johnson Cole, and son-in-law, Steven Cole) perpetuated by Johnson's companies and reported these events to Johnson in several meetings. Johnson agreed to address these issues but felt the concern of the Relator regarding the deprivation of funds from the U.S. Treasury and potential liability for fraud was unwarranted due to a contact he had internally at Blue Cross that "fixed things" so that his deceptions would go unnoticed.

57.

Johnson additionally bragged that the Blue Cross auditors were incompetent and incapable of discovering the over charging and misreporting of expenditures for reimbursement, which assessment has been substantiated by the failure of Blue Cross to discover or investigate these irregularities.

58.

Blue Cross failed to discover that the Provider's address on record with Blue Cross for the Mid-South Rehab Companies was in fact an empty office, while the actual operation was conducted at another location entirely.

59.

Through the gross negligence of Blue Cross with respect to the responsibility entrusted to it to ensure the program integrity of medical reimbursement to Providers Nathan Johnson, Lance Banks, Roger Heard, Bobby Long, Mid-South Louisiana, Mid-South Mississippi, Mid-South Management, Tri-therapy, CTX, JHL, LBJ, William Gaines, Mid-South Rehab Services, Inc., Mid-South Contract Services, Inc., Amy Johnson Cole, and Steven Cole, knowingly defrauded the United States Government by the following actions and activities:

1) Submitting false claims to Medicare;

2) Engaging in a related party transactions without informing Medicare and failure to disclose the extent of the relationship between defendants to Medicare;

3) Billing Medicare for renovation and construction on facilities in which defendant had an interest when it was not authorized under Medicare regulations;

4) Having Medicare pay for items which were not authorized, such as a boat;

5) Having Medicare pay the rent on a condominium which was not only a related party transaction, but was unnecessary and was used personally;

6) Passing along to Medicare the costs of personal expenses, such as the use of cellular

phones and reimbursement for purely personal expenses;

7)    Passing along to Medicare the cost of vehicles, rental on vehicles and insurance costs for vehicles unnecessary for business use and used primarily for personal reasons without any reimbursement;

8)    Billing Medicare for the costs of marketing employees and marketing activities which are not authorized;

9)    Billing Medicare for personal items which are not authorized;

10)    Engaging in imprudent economic practices with respect to unnecessary over compensation of office employees, unnecessary office expenses, and gross over compensation of certain therapists;

11)    Billing Medicare for purely recreational activities;

12)    Billing Medicare for the cost of unnecessary lodging for employees and others;

13)    Billing Medicare for the cost of unnecessary furniture and fixtures;

14)    Billing Medicare for unnecessary storage facilities;

15)    Billing Medicare for purely personal services on behalf of employees and others;

16)    Failure to attempt to collect bad debt in accordance with Medicare regulations;

17)    Billing Medicare for the cost of interior decoration not related to Medicare business;

18)    Billing Medicare for the expenses of unnecessary personal trips;

19)    Billing Medicare for rent payments ultimately paid to a related entity without disclosing that fact to Medicare;

20)    Billing Medicare for the cost of unnecessary employees, both family members and others;

21)    Billing Medicare for work that was not performed;

22)    Engaging in imprudent purchasing activities with respect to automobiles, computers

and services;

23)    Passing along to Medicare the costs of activities in an are a in which defendant had no Provider number;

24)    Engaging in related party transactions with other defendants and others;

25)    Billing Medicare for purely personal items, such as flowers and the expenses of a child's wedding;

26)    Billing Medicare for unnecessary and unrelated legal expenses.


60.

Ordinarily, once allowable costs are incurred by the Provider for services rendered by a third party creditor, the Provider recaptures those costs by reporting the same to Medicare, and receiving reimbursement funds to satisfy the debt. Medicare regulations allow the Provider one year from the close of the year in which costs are reported, and reimbursed to either pay the vendor, or return the funds to the Medicare programs.

61.

Those operating expenses for which those Providers may be reimbursed include short-term liabilities to third party creditors and Providers of services, including third party creditors who provide staffing services and management consulting services to the Medicare Provider, such as Relator.

62.

Relator did provide staffing services and management consulting services to Mid-South Management Company, Inc., Mid-South Rehabilitation Agency of Mississippi, Inc. and/or Mid-South Rehabilitation Agency of Louisiana, Inc. (hereinafter referred to collectively as "Mid-South Rehab Companies"), licensed Medicare Providers.

63.

Mid-South Management Co., Inc., is an administrative and management company for Mid-South Rehabilitation Agency of Louisiana, Inc., and Mid-South Rehabilitation Agency of Mississippi, Inc., Medicare certified rehabilitation agencies; and, as such, filed a Cost Report for the period ending December 31, 1996, with the Medicare Intermediary, Blue Cross.

64.

That Cost Report filed by Mid-South Management Co., Inc. reflects that the services rendered by and/or transactions made with Plaintiff herein were claimed as operating costs and included in the 1996 cost report submitted through the Medicare program, which costs were therefore approved for reimbursement by Blue Cross to the Mid-South Rehab Companies.

65.

Relator's services was discontinued on or about March 25, 1996.

66.

Relator discovered in June 1996 from Charlene Schultz, Vice President of Operations for Mid-South Management Company, Inc., that Johnson had created and implemented two additional companies for kick-back schemes that were owned with Bill Gaines, CPA, his daughter, Amy Johnson Cole, and his son-in-law, Steven Cole.

67.

The new entities operated out of the offices Medicare was providing 100% reimbursement to Johnson, all of which was not noticed by Blue Cross, despite the fact that a cursory examination of the facilities would have uncovered these facts.

68.

As the Mid-South Rehab Companies, as Medicare Providers, report all operating expenses

to Blue Cross, and are reimbursed for those costs through the Medicare system, the Medicare Provider Reimbursement Manual provides that funds paid to the Mid-South Rehab Companies by Medicare may not be used for any other expense than those indicated in the reports to the Medicare Intermediary, but must either be paid to the Plaintiffs for the operating cost reported by the Mid-South Rehab Companies, that justified the reimbursement or those funds  must be returned to Medicare if no such cost is in fact due and owing.

## PRAYER

**WHEREFORE**, relator prays that defendants be duly cited and served with a copy of this Original and Amended Complaint, and after all delays and due proceedings had and trial by jury herein, that there be judgment herein in favor of relator, Sherie Conrad, for an amount deemed reasonable in the premises and against defendants, jointly and severally, together with legal interest from the date of judicial demand until paid, expert fees and for all costs of these proceedings, treble damages, attorney's fees.  Relator further prays for trial by jury and all other general and equitable relief.

Relator, Sherie Conrad prays for judgment against all defendants and each of them specifically as follows:

(1)    Defendant, Blue Cross and Blue Shield of Mississippi, A Mutual Insurance Company, d/b/a Tri-Span  Health Services, be served with a copy of this Complaint, and be ordered to answer the same within the delays allowed by law; and

2)    That by reason of the violations of the False Claims Act this Court enter judgment against defendants in an amount equal to Three (3) times the amount of damages the United States Government has sustained because of defendants' actions, plus a civil penalty of not less than Five Thousand Dollars ($5,000.00) and not more than Ten thousand Dollars ($10,000.00) for each violation of 31 U.S.C. Section 3729;

3)      That Relator, as Qui Tam Plaintiff, be awarded the maximum amount allowed pursuant to Section 3730(d) of the False Claims Act and/or any other applicable provision of law;

4)      That Relator be awarded all costs and expenses of this action, including attorney's fees and court costs;

5)      That Relator be awarded appropriate relief pursuant to Section 3730(h) including an injunction, enjoining and restraining defendants from harassing and discriminating against her or any of her companies;

6)      That Relator have such other relief as the Court deems just and proper; and

7)      For trial by jury herein.

Respectfully submitted,

**THE TRUITT LAW FIRM**
A Limited Liability Company


_____
JACK E. TRUITT, PRO HAC VICE NO.: 45101
251 Highway 21
Madisonville, Louisiana 70447
Telephone: (985)792-1062
Facsimile: (985) 792-1065
Email: mail@truittlaw.com

AND

MARK WOLFE, PRO HAC VICE NO.: 44237
**WOLFE, BEGOUN & PICK, LLC**
818 Howard Avenue, Suite 100
New Orleans, Louisiana 70113
Counsel for Sherie Conrad


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been duly served on all counsel of record by depositing same into the U.S. Mail, postage pre-paid, this _19th_ day of

August, 2008 ____, or by any other means authorized by law.

_____